WR-78,545-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/8/2015 4:01:27 PM
Accepted 9/8/2015 4:17:41 PM
ABEL ACOSTA
CLERK

EX PARTE DAVID MARK TEMPLE

WR-78,540-02

IN THE COURT OF CRIMINAL APPEALS

AT

AUSTIN, TEXAS

_____

CAUSE NO. 1008763-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 178TH DIST. CT. |
| | § | OF |
| DAVID MARK TEMPLE, Applicant | § | HARRIS COUNTY, TEXAS |

**RESPONDENT'S/STATE'S OBJECTIONS TO THE HABEAS COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The State respectfully requests that the Court of Criminal Appeals consider the following objections to the state habeas court's findings of fact concerning alleged exculpatory evidence, conclusions of law concerning such evidence, and recommendation in the above-styled case, and the State also respectfully requests that this Court consider the Respondent's/State's Proposed Findings of Fact in cause no. 1008763-A (TCA No. WR-78,540-02), along with the instant objections.

1

# I. PROCEDURAL HISTORY

i. The applicant, David Mark Temple, was indicted and convicted of the offense of murder in cause no. 1008763 in the 178TH District Court of Harris County, Texas.

ii. The applicant was represented during trial by counsel Dick DeGuerin, Neal Davis, and Matthew Hennessy.

iii. On November 19, 2007, after the jury found the applicant guilty of murder, the jury assessed the applicant's punishment at life in the Texas Department of Criminal Justice – Institutional Division (TDCJ-ID) (XXIX R.R. at 107-10).

iv. On December 21, 2010, the Court of Appeals affirmed the applicant's conviction. *Temple v. State,* 342 S.W.3d 572 (Tex. App.-Houston [14TH Dist.] 2010, pet. granted).

v. On January 11, 2012, the Court of Criminal Appeals granted the applicant's petition for discretionary review, and, on January 16, 2013, the Court of Criminal Appeals affirmed the applicant's conviction. *Temple v. State,* 390 S.W.3d 341 (Tex. Crim. App. 2013).

vi. On October 10, 2012, the applicant filed an application for leave to file an original writ of habeas corpus with the Court of Criminal Appeals; on

October 31, 2012, the Court of Criminal Appeals denied leave to file an original writ and denied the original writ.

vii.    On April 7, 2014, the applicant filed his initial art. 11.07 application for writ of habeas corpus, cause no. 1008763-A, and a writ evidentiary hearing was held before visiting Judge Gist during December, 2014 and January and February, 2015.

**II.**

The state habeas court[1], citing *Brady v. Maryland,* 373 U.S. 83 (1963), found "that trial prosecutors either intentionally, deliberately or negligently failed to disclose the following facts to the defendant or disclosed the facts during the actual trial that prevented the defendant from fairly being able to timely investigate or effectively use the evidence 'irrespective of the good faith or bad faith of the prosecution.'" The habeas court then listed 36 items or pieces of information.

However, the habeas court's findings concerning alleged exculpatory evidence are either directly contradicted by the record, not supported by the record, or refer to information that is not exculpatory and/or material so that *Brady* is neither implicated nor violated:

---

[1] The Honorable Doug Shaver presided over the applicant's trial; all references to the trial court refer to Judge Shaver. The Honorable Judge Gist presided over the writ evidentiary hearing; all references to the habeas court refer to Judge Gist.

**<u>Habeas court's finding no. 9 is directly contradicted by the record and is not</u>**

**<u>supported by the record</u>**.

> *Habeas Court Finding No. 9:*
> The trial prosecutor never produced an FBI report which profiled the possible killer.

1a.   During the writ evidentiary hearing, the State introduced as State's Writ Hearing Exhibit 34 the transcript of a February 23, 2005 phone call between prosecutor Kelly Seigler and defense counsel Dick DeGuerin that was taped by DeGuerin and was in his trial file (XI WH at 123).[2]

2a.   During the phone call made two years before the applicant's trial, the prosecutor informed defense counsel that she had "the final reports from a profiler with the FBI and the shotgun residue reports" and that defense counsel could look at them "whenever" he wanted after they went to court next Wednesday.  *State's Writ Hearing Exhibit 34, transcript of taped phone call between defense counsel and prosecutor.*

3a.   During the writ hearing, defense counsel Neal Davis acknowledged that the transcript of the phone call showed that the prosecutor informed defense

---

[2] The State will use the following citations:
    exhibits introduced at trial will be referred to as State or Defense Trial Exhibits;
    exhibits introduced during the writ hearing will be referred to as State Writ Hearing or Defense Writ Hearing Exhibits;
    the trial record will be cited as (_ R.R. at _), and the writ hearing record as (_WH at _);
    the letter "a" is added to the numbers for the State's objection to differentiate them from the numbering of the habeas court's findings.

counsel DeGuerin of the existence of the FBI profile and invited counsel to look at it whenever he wanted (XI WH at 124-9).

4a.  During the writ hearing, defense counsel Dick DeGuerin acknowledged "that's what the words say" when presented with the FBI profile portion of the transcript of his taped phone call with the prosecutor (XXIII WH at 22).

5a.  During the writ hearing, defense counsel DeGuerin testified that he did not "remember seeing it [FBI profile report]" (XXIII WH at 78).

6a.  The record shows that the prosecutor informed defense counsel of the FBI profile and gave counsel access to the report by inviting counsel to view it at his convenience; the prosecutor did not withhold the FBI profile and defense counsel's lack of recollection years after the trial concerning the report does not show that the prosecutor "failed to produce it."

**Habeas court's findings nos. 28 and 29, dealing with the applicant's emotions, are cumulative of admitted evidence and are neither exculpatory nor material.**

> *Habeas Court Finding No. 28:*
> Deputy Brian Scudder saw the defendant after the murder with his head in his hands sobbing.
>
> *Habeas Court Finding No. 29:*
> Roseanne Martinez reported that the defendant appeared weak kneed after discovering the victim's body.

7a.  During the applicant's trial, neighbor Michael Ruggiero testified that the applicant banged on his front door, said his house had been broken into, asked

5

Ruggiero to call 911 and to take his son, ran back to his house followed by Ruggiero, and slammed the back door behind him as he went in the house (XVIII R.R. at 163-4, 168-xxx).

8a.   During cross-examination, Ruggiero testified that when the applicant's parents arrived at the scene, the applicant got out of the patrol car where he was sitting, and that the applicant's mother shrieked, almost fell to her knees, and hugged the applicant who got back in the car (XIX R.R. at 22).

9a.   During trial, Peggy Ruggiero testified that she saw the applicant at the scene and he looked dazed and in shock (XXI R.R. at 156).

10a.   During trial, Charles Kenneth Temple, the applicant's father, testified that the applicant was ashen and barely able to put sentences together when they arrived at the scene after they were called about 6:20 p.m. (XXII R.R. at 54-5).

11a.   During trial, Rebecca Temple, the applicant's sister-in-law, testified that she went to the scene and saw the applicant in a car; that the applicant was white as a ghost and had "utter shock" on his face; and, that she saw the applicant sobbing the next day at the Temple home (XXIII R.R. at 28-9).

12a.   During trial, Kevin Temple, the applicant's brother, testified that the applicant looked like he was in shock at the scene, and that the applicant was crying and emotional when Kevin saw him later around 3:00 a.m. (XXIII R.R. at 112-3).

13a. During trial, Maureen Temple, the applicant's mother, testified that the applicant got to the Temple home around 1:30 a.m. and he was crying and distraught (XXIV R.R. at 16-7).

14a. During trial, Deputy Johnson testified that the applicant appeared very calm and not upset when he informed officers that his wife had been shot (IX R.R. at 85-6).

15a. Detective Mark Schmidt testified that he arrived at the scene at 6:46 p.m.; that the applicant asked how long he had to sit in the back of the car; and, that the applicant appeared agitated when told his statement would be taken (XII R.R. at 162, 169-70).

16a. During trial, the applicant testified that he felt as if he was about to hyperventilate after finding the complainant's body and that "you can't put it into words of how you feel when you see somebody that you love that much in that shape" (XXV R.R. at 185).

17a. Evidence was presented at trial that the applicant's emotional range was described by others as agitated, in shock, in a daze, ashen, "white as a ghost," "utter shock," crying, and very emotional – as well as calm, and the applicant himself described his emotions to the jury.

18a. Any statement that the applicant had his head in his hands sobbing and he appeared weak-kneed after discovering the complainant's body is cumulative of

7

the emotions reported at trial and does not constitute exculpatory or material evidence so that it is reasonably probable that the results of the proceeding would have been different.

19a.  The State cannot suppress the applicant's own actions and emotions – things about which the applicant testified at trial and about which he could have testified in more detail if he chose (XXV R.R. at 181-8).

**Habeas court's finding no. 31 is not supported by the record; the State did not withhold the time of the murder – a time that was never specifically established.**

> *Habeas Court Finding No. 31:*
> The State did not disclose the Harris County administrative bulletin indicating that the murder took place between 4:15 p.m. and 5:30 p.m.

20a.  During trial, the applicant testified that the complainant arrived home around 4:00 p.m. on January 11TH and he then left the house with his son about 4:00 or 4:05, "somewhere in there," and went to a park for a few minutes, then Brookshire Brothers grocery, and Home Depot before returning home and finding the complainant's body (XXV R.R. at 151, 158-69).

21a.  Two days after the complainant's January 11, 1999 murder, the Harris County Sheriff's Office prepared a synopsis of the case noting "Time of Occurrence:  Between 4:15 and 5:30 p.m." – an initial speculation made shortly

after the offense and never confirmed (XXIX WH at 7). *See Defense Writ Hearing Exhibit 3, scanned cd of offense report, Bates Stamp 3.*

22a. During grand jury testimony, Detective Mark Schmidt affirmed that there was not a definite time of death and the lack of a definite time had been discussed with the medical examiner's office (March 31, 1999 grand jury testimony at 65).

23a. Dr. Dwayne Wolf, Deputy Medical Examiner, testified at trial that he reviewed Dr. Vladimir Parungao's autopsy report and findings; that the exact time of the complainant's death could not be pinpointed; and, that the best he could say was that she died sometime the day before the autopsy (XX R.R. at 138-9).

24a. During defense counsel's cross-examination of Dr. Wolf, counsel unsuccessfully attempted to elicit testimony pinpointing a time of death but was unable to do so (XX R.R. at 161).

25a. During trial, Dr. Wolf testified that the complainant suffered a contact shotgun wound to the back of her head so that her brain was avulsed, i.e., were actually outside her head and recovered separately at the scene, and that the complainant's death was "as instantaneous as death ever is" (XX R.R. at 133, 140-2, 157).

26a. The complainant's death was "instantaneous" so that the time of her murder would be the same as the time of her death – a time that could not be

established according to expert testimony; the initial estimate by the Sheriff's Office was just that – a speculative estimate that was never confirmed – and does not constitute exculpatory evidence.

**Habeas court's findings nos. 3 and 10, dealing with alleged withholding of _Brady_ evidence concerning Riley Joe Sanders' statements, are not supported by the record, are directly contradicted by the record, and/or lack materiality.**

*Habeas Court Finding No. 3:*
Riley Joe Sanders was interviewed by 7 different officers on 6 days. After Sanders testified, the State did not disclose his oral statements from Jan. 11, 1999, Jan. 12, 1999, Jan. 14, 1999, Jan. 28, 1999, Jan. 29, 1999 or Feb. 1, 1999; nor did the State produce any of the polygraph tests or questions used in the examinations.[3]

*Habeas Court Finding No. 10:*
In January, 1999, Riley Joe Sanders was interviewed by Officers Hernandez and Lampson and gave 2 oral statements. Neither was disclosed.

27a.  The defense was aware of Riley Joe Sanders as a possible suspect well before the applicant's 2007 trial:  on March 10, 1999, the applicant's attorney Paul Looney sent a fax to prosecutor Ted Wilson expressing the Temple family's belief that Sanders was a possible suspect (XXX WH at 11); on March 17, 1999, Wilson

---

[3] The portion of habeas court finding no. 3, dealing with polygraph exams, is addressed in a later section of the State's objections.  *See 38a – 56a, infra.*

Also, Sanders' January 28TH statement was written, not oral as stated in the habeas finding, and was introduced into evidence during trial by defense counsel DeGuerin (XXVI R.R. at 236).  A review of the offense report shows that Sanders gave a January 25TH oral statement, not a January 29TH oral statement.  *See 34a, n.6, infra.*

sent a letter to Looney asking for the sources of the information and stating that he was passing the information to the Harris County Sheriff's Office (XXVI WH at 11); and, during the writ hearing, defense counsel DeGuerin acknowledged that he was aware of Sanders as a possible suspect as early as March 15, 2005 – two years before the applicant's trial (XXII WH at 11-3). *State's Writ Hearing Exhibit 5, Wilson's letter to Looney; State's Writ Hearing Exhibit 6, fax cover sheet to Ted Wilson on March 10, 1999 from Lampson & Looney; Defense Writ Hearing Exhibit 12, Facsimile of Temple Family Outline, February 10, 1999 letter from Temple family to Ted Wilson.*

28a. Sanders gave five oral and two written statements in 1999:

| EVENT | Jan11 ORAL | Jan 12 ORAL | Jan 14 ORAL | Jan 25 ORAL | JAN. 28 WRITTEN | FEB. 1 ORAL | FEB. 1 WRITTEN |
|---|---|---|---|---|---|---|---|
| Lunch on Jan. 11TH | ----- (event not mentioned) | went home at lunch & saw man with pole like meter reader | ----- | ----- | ----- | ----- | ----- |
| Sanders & Cody Ellis left school | in school all day | ----- | skipped 7TH period | ----- | left school after 6TH period | NO TIME GIVEN | about 1:50 |
| Arrived at Sanders' house and left | ----- | ----- | ----- | ----- | about 2:00, left after collecting marijuana | NO TIME | about 2:00 or 2:05, left about 5 min. later |
| Arrived at Ellis' house | ----- | ----- | ----- | about 3:20 | NO TIME | NO TIME | about 2:50 |
| Left Ellis' house | ----- | ----- | ----- | NO TIME | talked to Ellis' father 10-15 min. | stayed about 20 min. | about 3:15 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Sanders arrived home** | ----- | ----- | ----- | NO TIME | about 3:30 | NO TIME | NO TIME |
| **Granthom & Towner arrived at Sanders'** | ----- | ----- | ----- | shortly after 3:30 | about 3:45–3:50 | about 3:30 | about 3:30 |
| **Left for Randy Hess' house** | ----- | ----- | ----- | NO TIME | NO TIME | about 3:45 | about 3:50 |
| **Left Randy Hess' house** | ----- | ----- | ----- | NO TIME | Talked to Randy about 10-15 min. before leaving | Stayed about 15 minutes Sanders saw def's truck during his walk home | Talked to Randy at least 20 to 30 minutes Sanders saw truck like def's truck while walking home |
| **Sanders arrived home** | ----- | ----- | ----- | NO TIME | About 4:20/30 | NO TIME | About 4:20/30 |
| **Went to convenience store** | ----- | ----- | ----- | About 4:30 or 4:40 | NO TIME | About 4:30 | NO TIME |
| **Sanders dropped at his house** | ----- | ----- | ----- | NO TIME | About 4:35– 4:40 | About 4:45 | About 4:40 or 4:45 |
| **Dog** | ----- | Knew applicant had Chow dog | ----- | ----- | ----- | ----- | ----- |
| **Neighbor told Sanders he heard backfire** | ----- | NO TIME | ----- | ----- | -----[4] | ----- | ----- |

[4] The last paragraph of Sanders' January 28TH statement discusses an unrelated burglary. *See 79a – 84a, 117a, and 119a, infra.*

29a.  Sanders' statements were given to the following officers; Sanders also testified before the grand jury in April, 1999:

| DATE | TYPE OF STATEMENT | GIVEN TO |
|---|---|---|
| January 11, 1999 (given to defense) | Oral | Detective Shipley |
| January 12, 1999 | Oral | Deputy Gonzalez and Deputy Carillo |
| January 14, 1999 (given to defense) | Oral | Deputy Wichowski |
| January 25, 1999 | Oral | Deputy Hernandez and Detective Lampson |
| January 28, 1999 (given to defense) | Written | Deputy Lampson |
| February 1, 1999 (given to defense) | Oral | Detectives Leithner and Schmidt |
| February 1, 1999 (given to defense) | Written | Deputy Hernandez |
| April, 1999 (given to defense) | Grand Jury testimony | 209TH Grand Jury |

30a.  The portion of habeas court's finding no. 3 – that the State did not disclose Sanders' January 11, 1999, his January 14, 1999, and his February 1, 1999 oral statements after Sanders' testified - is directly contradicted by the record; the State provided defense counsel DeGuerin the statements before Sanders testified through the reports of testifying officers Shipley, Wichowski, Leitner, and Schmidt, and counsel confirmed during the writ hearing that he received the portions of the offense report generated by the testifying officers (V WH at 129-

13

30). *See Defense Writ Hearing Exhibit 38, counsel DeGuerin's hand-written notes from his review of offense reports he was provided at trial; see also (V WH at 143), DeGuerin states that he planned to cross-examine Detective Leithner with Leithner's report.*

31a. The portion of habeas court's finding no. 3 – that the State did not disclose Sanders' January 28 and his February 1, 1999 oral statements - is directly contradicted by the record; Sanders' gave a written, not oral, statement on January 28TH and a written statement on February 1ST; both written statements were given to defense counsel who introduced them into evidence at trial (XXVI R.R. at 236); Sanders' February 1ST oral statement was supplied to defense counsel through the offense report of Detective Leithner. *See 30a, supra.*

32a. Defense counsel did not receive Sanders' January 12, 1999 oral statement because the officers who heard the statement did not testify at trial; Sanders' January 12TH oral statement asserts that he knew the Temples had a Chow dog; that the neighbor across the street told him he heard a backfire; and, that he went home for lunch on the 11TH and saw a man holding a pole like the ones used to open water meters.[5] *See 28a and 29a, supra.*

---

[5] During Detective Mark Schmidt's grand jury testimony, he confirmed that the electric company had a meter reader in the neighborhood that day; during the writ hearing, defense counsel acknowledged that he was aware of the meter reader being in the neighborhood (XXII WH at 159). *See also April 4, 1999 grand jury testimony at 21.*

33a. Sanders' January 12TH oral statement does not contain information that discredits Sanders nor adds exculpatory or material information to the disclosed statements based on extensive evidence being presented at trial about several neighbors being aware that the applicant had a Chow dog, based on the lack of materiality of a man being in the neighborhood hours before the offense checking meters and defense being aware that a neighbor heard a backfire. *See 96a – 100a, re neighbors' testimony concerning dog; supra; see also 155a – 159a, re defense counsel being aware of neighbor Joe Cadena's oral statement that he heard pops he thought were a truck backfiring the afternoon of the offense, supra.*

34a. Habeas court's finding no. 3 erroneously refers to Sanders' January <u>29</u>, 1999 oral statement; however, a review of the offense report shows that the applicant did not give an oral statement on January 29TH; instead, he gave an oral statement on January 25TH to Deputy Hernandez and Detective Lampson.[6]

35a. Defense counsel did not receive Sanders' January 25TH oral statement because the officers who heard the statement did not testify at trial, however, the non-disclosure does not constitute *Brady* evidence: the information in Sanders'

---

[6] It should be noted that Detective Leithner's supplement #15, given to defense counsel, refers to Deputy Hernandez and Detective Lampson interviewing Sanders on "01-29-99" about his actions on the afternoon of January 11, 1999. A review of the offense report shows that the "01-29-99" date should actually be January 25, 1999 – the date that Hernandez and Lampson took an oral statement from Sanders about his actions on the afternoon of January 11TH.

January 25TH statement was also provided in Sanders' disclosed statements and does not constitute exculpatory information. *See 28a, supra.*

36a. The only time difference from Sanders' January 25TH oral statement to any of his other statements is the time approximation he gives for arriving at Cody Ellis' house; however, such difference is neither exculpatory nor material based on the approximated time being before the complainant arrived home and based on the consistency of all other times approximated. *See 28a, supra.*

37a. The State did not violate *Brady* concerning Sanders' statements; three of Sanders' five oral statements were properly offered to defense counsel through the testimony of various officers before Sanders' testified so that defense counsel could review the statements; both of Sanders' written statements were properly given to defense counsel prior to cross-examination of Sanders; the two oral statements – not given to counsel because the officers making the report did not testify - did not contain exculpatory or material evidence so that there is not a reasonable probability that the results of the proceeding would have been different if the remaining two oral statements were provided.

**The remaining portion of habeas court's finding no. 3 – that the State did not produce any of the polygraph tests or questions used in the examinations – is not supported by the record concerning production of the results of the test**

16

**and is neither exculpatory nor material concerning the questions used in the examination; the same is also true of habeas court's findings nos. 16 and 18.**

> *Habeas Court Finding No. 3:*
> Riley Joe Sanders was interviewed by 7 different officers on 6 days. After Sanders testified, the State did not disclose his oral statements from Jan. 11, 1999, Jan. 12, 1999, Jan. 14, 1999, Jan. 28, 1999, Jan. 29, 1999 or Feb. 1, 1999; *nor did the State produce any of the polygraph tests or questions used in the examinations.*
>
> *Habeas Court Finding No. 16:*
> On Feb.1, 1999, Towner is given a polygraph test. The questions asked were never disclosed.
>
> *Habeas Court Finding No. 18:*
> On Feb. 10, 1999, Granthom is given a polygraph test and although he was determined to be deceptive, the questions asked were never disclosed.

38a. During the applicant's trial, Detective Leithner testified that Riley Joe Sanders, a student at Katy High School and a neighbor of the applicant's, was talked with three or four times; that his parents were talked with; that statements were taken from Sanders about the afternoon of the offense; and, that Sanders skipped school on January 11TH (XII R.R. at 86-93).

39a. At that point in Leithner's testimony, a bench conference was held during which defense counsel stated that he wanted to go into the fact that Sanders had failed three polygraphs and refused a fourth one, and the trial court denied the request to elicit testimony about polygraphs (XII R.R. at 92-3).

40a. After the trial court denied defense counsel's request to elicit testimony about the polygraphs, defense counsel proffered a bill of exception outside the presence of the jury during which he referred to Leithner's supplement #15 of the offense report and questioned Leithner about Sanders smoking marijuana the day of the offense and being with several friends in the neighborhood that afternoon, about Sanders giving statements; about Sanders taking three polygraphs and failing the first and showing deception on the second; about Sanders refusing a fourth polygraph, about the complainant telling Sanders' parents about Sanders missing school; and about Leithner telling Sanders' parents that Sanders could not be eliminated because of his failed polygraph (XII R.R. at 94-7).

41a. At the conclusion of defense counsel's bill of exception, the trial court refused to allow counsel to cross-examine Leithner concerning polygraphs (XII R.R. at 100).

42a. During defense counsel's cross-examination of Leithner, counsel referred to Leithner's supplement 18 of the offense report and asked about Sanders' skipping school on January 11TH, about interviewing Sanders and taking statements from him, and about not being satisfied with his statements, although Leithner testified that he was satisfied due to other information (XII R.R. at 104-5, 112-5).

18

43a. Outside the presence of the jury, defense counsel referred to Leithner's supplements #19 and #26 of the offense report and questioned Leithner about Michael Granthom, Cody Towner, Cody Ellis, Jonathan Pena, Carlos Cardo (sic), and Casey Goosby; about several of them being together in the neighbor that afternoon skipping school, about Granthom taking a polygraph and showing deception, about Towner taking a polygraph and taking LSD the same day, about Ellis taking a polygraph and smoking marijuana the same day, and about Leithner asking for help from the school counselor to reformat the questions (XII R.R. at 139-44).

44a. At the conclusion of defense counsel's questioning outside the presence of the jury, counsel asked to be able to cross-examine Leithner about his statement that he was satisfied with Sanders' responses, and the trial court ruled that counsel could cross-examine Leithner but he could not mention polygraph exams or who offered or refused to take them (XII R.R. at 144).

45a. Based on the testimony elicited by defense counsel outside the presence of the jury, counsel was aware of the polygraphs given to Sanders, Michael Granthom, Cody Towner, and Cody Ellis, of Towner and Ellis taking drugs the day of their polygraphs, and of the results of the tests.

46a. Detective Leithner's supplements #21, #23, and #26, given to defense counsel, not only deal with Sanders, Granthom, Towner, and Ellis taking

polygraphs but also contain a list of the questions given to Cody Towner during his polygraph, a list of questions that Leithner gave to a teacher at Katy High School to review, and a list of the questions that the teacher subsequently sent to Leithner for purposes of polygraph testing. *See Defense Writ Hearing Exhibit 3, offense report, Leithner's supplements #21, #23, and #26, Bates Stamp 001957-001958, 001960-001962, 001969-001974.*

47a. The tenor of the suggested polygraph questions and the questions asked of Cody Towner concentrated on asking the person being tested if he knew who shot the complainant, if he shot the complainant, if he was in or near the Temple home the day the complainant was shot, if he knew anything about the complainant's death, and if he shot a shotgun on January 11, 1999. *Id.*

48a. Leithner's supplement #19, given to defense counsel, notes that Cody Ellis' polygraph showed signs of deception although the examiner would note that he had smoked marijuana the date of the test; that Cody Towner appeared truthful but the testing could not be considered accurate because he had used LSD that day; that Michael Granthom appeared deceitful but he had complained he was not feeling well so the examiner advised that he be retested but his parents declined to allow retesting; that Towner told the examiner when he met for retesting that he thought the applicant committed the offense and that his mother told him that the applicant killed his wife so the examiners "advised that due to this explanation and

20

the fact that Towner had appeared to be truthful in the pertinent areas of being involved and being inside the house he believes the subject to be truthful" but the examiner would have to show him as deceptive due to the overall score. *See Defense Writ Hearing Exhibit 3, offense report, Leithner's supplement #19, Bates Stamp 001950-001952.*

49a. Although a list of questions asked during all the non-admissible polygraphs was not given to defense counsel, the specific questions, to which neither Sanders, Ellis, Towner, nor Granthom admitted culpability, were not exculpatory to the applicant and would not have resulted in a different trial result if they had been known; the trial court properly refused to allow defense to present evidence concerning the polygraph exams – the results of which defense counsel was aware and the tenor of the questions of which defense counsel was aware.

50a. Defense counsel was well-aware of Sanders as a possible suspect during counsel's pre-trial investigation and during trial; defense counsel acknowledged during trial that he knew about Sanders' school records which counsel subpoenaed on February 23, 2005, two years prior to trial, and which showed that Sanders left school before 7TH period on January 11, 1999 and was not in school on January 12TH (XXV R.R. at 113)(XXII WH at 112), and a note in counsel's trial file showed that counsel was aware of Sanders' address in Arkansas

after he moved from Katy (XXVIII WH at 15-6). *See State's Writ Hearing Exhibits 73 and 74, note in defense counsel's file re Sanders' address.*

51a.    During cross-examination of neighbor Michael Ruggiero at trial, defense counsel elicited testimony that Sanders' father seemed agitated while talking with him the day after the offense, and that Sanders would get in fights, was not good with authority figures, and would talk back (XIX R.R. at 14-7).

52a.    In the defense's case-in-chief, counsel elicited testimony from Detective Leithner concerning Sanders skipping school on the afternoon of the offense, giving statements, admitting that he was in the neighborhood near the complainant's house that afternoon, and admitting smoking marijuana and trying to get more marijuana that afternoon (XXV R.R. at 115).

53a.    Sanders testified in detail at trial as a State's rebuttal witness concerning his activities the day of the offense, his not having any problems with the complainant who was a good teacher who treated him well; about having no hard feelings about the complainant telling his parents about him frequently skipping school, and, about being questioned by detectives, giving statements, and testifying before the grand jury (XXVI R.R. at 152-94).

54a.    On cross-examination, defense counsel questioned Sanders about skipping school, getting in trouble, smoking dope, driving without a license, having his truck taken away by his parents, driving his truck even after it was taken

22

away by his parents, his friends' destroying the complainant's Christmas yard decorations, and the complainant telling his parents about him skipping school and finding beer bottles in her yard (XXVI R.R. at 207-11, 215-9).

55a. During guilt-innocence jury argument, defense counsel argued that there was more circumstantial evidence against Sanders than against the applicant and argued that Sanders committed the offense (XXVI R.R. at 18-24).

56a. On direct appeal, the Court of Appeals rejected the applicant's claim that the his due process rights under *Brady v. Maryland,* 373 U.S. 83 (1963), were violated because the State did not allegedly disclose exculpatory evidence regarding Sanders until after trial had begun and also rejected the claim that the trial court erred by denying the applicant's motion for continuance to utilize this information; the Court of Appeals held that, even if the applicant had preserved his *Brady* claim, the applicant failed to show *Brady* error based on the evidence elicited during trial concerning Sanders, Sanders' testimony, defense counsel's thorough cross-examination of Sanders, counsel's "methodical series of questions" concerning Sanders when questioning the applicant, and counsel's focus during closing argument on Sanders' alleged participation in the offense. *See Temple v. State,* 342 S.W. 572, 592 (Tex. App.-Houston [14TH Dist.] 2012, pet. granted), *affirmed,* 390 S.W.3d 341 (Tex. Crim. App. 2013).

**Habeas court's findings nos. 8 and 17, dealing with the alternative suspect claim, are not supported by the record.**

> *Habeas Court Finding No. 8:*
> The State failed to produce prior to trial, the written statements of Cody Ellis, Cody Towner, Michael Gradham (sic), Jonathon Pena, Riley Joe Sanders, Casey Goosby or Carlos Corro, all of which would have supported an alternative suspect claim.

> *Habeas Court Finding No. 17:*
> On Feb. 1, 1999, Granthom gave a written statement to law enforcement and the contents have never been disclosed.

57a. The written statements of Cody Ellis, Cody Towner, Michael Granthom, Jonathon Pena, Casey Goosby and Carlos Corro – all of which were disclosed during the writ hearing - serve to corroborate Riley Joe Sanders' statements and testimony; they are not exculpatory to the applicant and do not support an alternative suspect claim – a defense theory thoroughly presented by defense counsel at trial and a defense theory rejected by the jury.

58a. The written statements of Riley Joe Sanders were provided to defense counsel and, as with the other cited statements, are not exculpatory to the applicant and do not support an alternative suspect claim – a defense theory thoroughly presented by defense counsel at trial and a defense theory rejected by the jury. *See 29a – 37a, supra.*

**Habeas court's finding no. 32 maintains that the State failed to produce oral statements to law enforcement of witnesses *after* they testified; however, it**

24

**should be noted that the record shows that the State produced the oral statements of witnesses made to law enforcement *before* the witnesses testified; the State did not withhold the statements.**

*Habeas Court Finding No. 32:*
During trial, the State failed to produce oral statements to law enforcement of witnesses after they testified.

59a.  The following witnesses testified for the State during guilt-innocence in the following order:  Deputy Virginia Johnson, Detective Dean Holtke, Lab Director William Watson, Detective Charles Leithner; Detective Mark Schmidt, Quinton Harlan, Tammy Harlan, Detective Tracy Shipley, Heather Scott Temple, Margaret Christen; Tara Hall, Clint Stockdick, Jennifer Stockdick, Debbie Berger, Linda Garcia, Venetta George, Matt Clemens, Renny Buck, Angela Vielma, Mike Ruggeriero, Bernard Bindeman, Shannon Buell, Tracy Mullins, Maria Meijide, Jeff Greenwood, Natalie Scott, Robert Schrader, Barbara Watt, Laura Baum, Dr. Dwayne Wolf, and Brenda Lucas.

60a.   The oral statements of Mike Ruggiero, Tara Hall, Heather Scott, Quinton Harlan, Debbie Berger, and Tracy Mullins were contained in the portions of the offense report prepared by Detective Mark Schmidt; thus, defense counsel received the oral statements of these witnesses when Detective Schmidt testified on October 22ND and 23RD *prior* to the October 23RD and 24TH testimony of Quinton Harlan, the October 25TH testimony of Heather Scott Temple and Tara Hall, the

25

October 31ST and November 1ST testimony of Michael Ruggiero, and, the November 1ST testimony of Tracy Mullins. *See Defense Writ Hearing Exhibit 3, offense report, Schmidt's supplements #2, #3, #21, Bates Stamp 002056-002058, 002061-002062, 002106; see also Schmidt' supplement, Bates Stamp 002116-002117.*

61a. The oral statements of Margaret Christian, Debbie Berger, and Heather Scott Temple were contained in portions of the offense report prepared by Detective Tracy Shipley; thus, defense counsel received these oral statements when Detective Shipley testified on October 24TH and 25TH *prior* to the October 25TH testimony of Margaret Christen and Heather Scott Temple, and the October 30TH testimony of Debbie Berger. *See Defense Writ Hearing Exhibit 3, offense report, Shipley's supplements #7 and 9, Bates Stamp 000235-000236, 000243-000244; see also Shipley's supplement, Bates Stamp 000135.*

62a. The oral statements of Michael Ruggiero, Heather Scott Temple, Quinton Harlan, and Brenda Lucas were contained in portions of the offense prepared by Detective Charles Leithner; thus, defense counsel received these oral statements when Detective Leithner testified on October 18TH and October 22ND *prior* to the October 23RD and 24TH testimony of Quinton Harlan, the October 25TH testimony of Heather Scott Temple, the October 31ST and November 1ST testimony of Michael Ruggiero, and the November 5TH testimony of Brenda Lucas. *See*

*Defense Writ Hearing Exhibit 3, offense report, Leithner's supplements #7, #13, and #20, Bates Stamp 001920, 001935-001936, 001953-001955; see also Leithner's supplement, Bates Stamp 001891-001892, 001906-001907.*

63a. Jennifer Stockdick, daycare worker Linda Garcia, Brookshire Brothers employee Venetta George, firearms examiner Matthew Clemens, lab director William Watson, fire department dispatcher Shannon Buell, paramedic Maria Meijide, insurance adjuster Jeff Greenwood, Home Depot loss prevention supervisor Renny Buck, neighbor Robert Schrader, neighbor Barbara Watt, neighbor Laura Baum, and medical examiner Dr. Dwayne Wolf did not make oral statements although some issued reports provided to defense counsel.

64a. The following witnesses gave written statements provided to defense counsel: Quinton Harlan, Tammy Harlan, Debbie Berger, Angela Vielma, Bernard Bindeman, Natalie Scott, and Brenda Lucas.

65a. The habeas court noted, prior to citing the 36 items, that "prosecutors either intentionally, deliberately, or negligently failed to disclose the following facts [36 listed items] to the defendant *or disclosed the facts during the actual trial that prevented the defendant from fairly being able to timely investigate or effectively use the evidence…*"

66a. The habeas court's cited statement concerning disclosure during trial is directly contradicted by the record which shows that defense counsel was given

27

adequate time to review items he received at trial and also shows that defense counsel conducted extensive investigation prior to trial, was more-than-prepared at trial; and, that he was able to thoroughly and extensively cross-examine the State's witnesses:

- Detective Holtke testified on direct on October 16 and 17, 2007 (IX R.R. at 121-201)(X R.R. at 11-169).

- Defense counsel's cross-examination of Holtke began on October 18 (XI R.R. at 5-121), so that defense counsel had overnight to prepare his cross-examination; also, Holtke's report consisted largely of the results of testing – results given to defense counsel prior to trial. *See Defense Writ Hearing Exhibit 3, offense report, Bates Stamp 528-605; see also Bates Stamp 454-62*.

- Detective Leithner testified on direct on October 18 and October 22, 2007 (XI R.R. at 173-221)(XII R.R. at 14-103).

- Defense counsel's cross-exam of Leithner began on October 22 (XII R.R. at 103-57).

- Defense counsel had Leithner's reports during Leithner's direct testimony as shown by defense counsel's reference at the bench to Sanders' polygraph tests – information in Leithner's report (XII R.R. at 92) and by defense counsel's reference to Leithner's supplement #15 during counsel's bill of exception done outside the presence of the jury while Leithner was still on direct XII R.R. at 97).

- During defense counsel's cross-examination of Leithner, counsel refers to Leithner's supplement #18 (XII R.R. at 104), also page 3 of supplement #18 (XII R.R. at 121), supplement #19 (XII R.R. at 140), and supplement #26 (XII R.R. at 143), and thoroughly questioned Leithner about the contents of his reports (XII R.R. at 103-57).

o Detective Mark Schmidt testified on direct on October 22 and 23, 2007, concerning the crime scene, the complainant's cell phone records, the stores' video tapes showing the applicant, the complainant's jewelry reported missing, the applicant's father buying a shotgun in 1985, obtaining two shotguns from Sanders' father for testing, the amount of time it took to drive from one location to another in Katy, obtaining a search warrant for the applicant's storage facility, getting Quinton Harlan's statement, and arresting the applicant pursuant to a warrant (XII R.R. at 160-234)(XIII R.R. at 9-73).

o Defense counsel thoroughly cross-examined Schmidt on October 23RD about the shotgun shells obtained from Sanders' father, Heatherington's shotgun, the shotgun obtained from Mrs. Cain, about gun records, driving times and phone records, about finding no guns or ammunition in the applicant's storage unit, about other people hearing a gunshot; about the Parkers' dog barking; about police searching for a weapon, and about the applicant's dog (XIII R.R. at 75-180).

o After fellow football coach Quinton Harlan testified on direct on October 24, 2007 (XIII R.R. at 184-224)(XIV R.R. at 6-43), the prosecutor tendered Harlan's grand jury testimony to defense counsel and the trial court took a break to give defense counsel time to read it (XIV R.R. at 43).

o During cross-examination of Quinton Harlan, defense counsel questioned him about his written statement and grand jury testimony (XIV R.R. at 46-64).

o Tammy Harlan, Quinton Harlan's wife, testified on direct on October 24, 2007 about her friendship with the complainant, about the complainant's and applicant's marriage, and about the applicant wanting to know what she said in the grand jury (XIV R.R. at 94-136).

o During defense counsel's cross-examination of Tammy Harlan, counsel questioned her about what she said in the grand jury and asked her to silently read her grand jury testimony –

29

showing that counsel had been given the testimony (XIV R.R. at 138).

o During cross-examination of Tammy Harlan, the trial court ordered a break in proceedings for the jury; thus, counsel had more time to review her prior testimony (XIV R.R. at 143).

o After Detective Shipley testified on direct concerning taking the applicant's mother's statement, talking to teachers at Katy High School to get a timeline for when the complainant left school on January 11TH, canvassing the neighborhood on January 25TH, and taking Heather Scott's statement about her relationship with the applicant, the following occurred:

- Mr. DeGuerin (defense counsel): I would like to have the report and time to read it.

- Ms. Siegler (prosecutor): (Complies).

- Mr. DeGuerin: And grand jury testimony, if there is any.

- Ms. Siegler: There's not.

- The Court: What does that look like?

- Mr. DeGuerin: The pages aren't numbers. It looks like about 20, 25 pages.

- The court: All right. Members of the jury, remember your admonitions. Take another coffee break and we'll see you back at 5 till 4:00.

- *(Recess)*

- *(Jury Seated)*

- THE COURT: All right. If you will all be seated. Members of the jury, the way the law basically works, when a witness is finished testifying, then the other side is entitled to the statements, grand jury testimony

30

or whatever it might be, and they need time to go through it all before they cross-examine or examine the witness. In this instance, Mr. DeGuerin has not had sufficient time to go through the number of pages he has to go through, so I have encouraged the lawyers to work a little better together in the future as to where we don't have these delays. Hopefully, they will (XIV R.R. at 173-4).

o Defense counsel conducted cross-examination of Detective Shipley the next day on October 25, 2007 (XV R.R. at 5-18).

o During direct examination of Heather Scott Temple on October 25, 2007, the prosecutor questioned her about her relationship with the applicant prior to the complainant's murder, their marriage, the complainant's murder, Scott Temple's January 12, 1999 written statement, her January 26, 1999 written statement, and her emails (XV R.R. at 23-103).

o During cross-examination, defense counsel questioned Scott Temple about the contents of her written statements and referred to her grand jury testimony (XV R.R. at 111-16).

o After taking a break, defense counsel continued his cross-exam of Scott Temple (XV R.R. at 116); a review of counsel's cross-examination shows that Scott Temple was a sympathetic witness for the defense and that defense counsel was well-aware of the contents of her testimony prior to cross-examination (XV R.R. at 107-48, 155-8).

o During Scott Temple's testimony, the prosecutor stated that she gave defense counsel copies of Scott Temple's emails two weeks ago (XV R.R. at 142).

o Tara Hall Engler, Heather Scott Temple's former roommate, testified on direct on October 25, 2007 concerning what she knew about the applicant's and Scott Temple's relationship and about giving two statements to police (XV R.R. at 188-215).

31

o During cross-examination, defense counsel asked Engler about her statements and when Engler said she thought hers "was earlier than that," defense counsel stated, "I'm just going by the date on it" – showing that he had Engler's statements (XV R.R. at 230).

o After the direct testimony of Clint Stockdick, who did not give either a written or oral statement, the trial court excused the jury for a break and defense counsel began cross-examination after the break (XVII R.R. at 65-5).

o After the direct testimony of Venetta George, who did not give either a written or oral statement, concerning the surveillance tape from Brookshire Brothers, the trial court excused the jury for a break and defense counsel began cross-examination after the break (XVII R.R. at 194).

o During the cross-examination of Matthew Clements, firearms examiner, defense counsel introduced Clemens' report on the examination of the Beretta shotgun into evidence and afterward stated, "You know what, here's an extra copy that I was furnished" (XVIII R.R. at 75-7).

o Defense counsel questioned Clements referring to and using the report which counsel had been furnished (XVIII R.R. at 77-90).

o During cross-examination of Angela Vielma, defense counsel showed Vielma her written statement and questioned her about its contents (XVIII R.R. at 134-41).

o During cross-examination of Michael Ruggiero, the applicant's neighbor, defense counsel asked Ruggiero:

▪ DEFENSE COUNSEL: They didn't put it in your statement, though, did they?

▪ RUGGIERO: It's not in the statement, no.

- **DEFENSE COUNSEL:** But it is in your grand jury testimony when the grand jurors asked you about suspicious circumstances, right (XIX R.R. at 13).

o During re-direct of Ruggiero, the prosecutor elicited testimony that Ruggiero actually typed his own statement; that he could have added things if he wanted; that he had met with the prosecutors once but he "met with Dick a couple of times;" that Ruggiero brought defense counsel DeGuerin and Ruggiero's lawyer to the only meeting he had with prosecutors; that Ruggiero had also met with defense counsel's investigator Ralph Warner and talked with him on the phone; that he had met with defense counsel three times without Ruggiero's lawyer being present; and, that he spoke with defense counsel prior to his testimony today (XIX R.R. at 23-34).

o The prosecutor referred to Bernard Bindeman's written statement during direct examination and questioned him about its contents (XIX R.R. at 86-90); defense counsel made no assertion that he had not been given the statement nor did he request additional time to review the statement before beginning cross-examination (XIX R.R. at 91).

o Defense counsel's initial questions on cross-examination of Brenda Lucas, the complainant's sister, concerned her written statement:

- **DEFENSE COUNSEL:** Ms. Lucas, you did give a written statement on the same - - let's see - - on January the 11TH?

- **LUCAS:** No.

- **DEFENSE COUNSEL:** Is the date wrong on the statement? You have seen the statement?

- **LUCAS:** Yes.

33

- **DEFENSE COUNSEL:** It has a date of January the 11TH. Did they just put the wrong date on it (XX R.R. at 252-3).

  o Shannon Buell, the 911 dispatcher; Tracy Mullin, the custodian of audio records at the Harris County Sheriff's Office; Maria Meijide, the paramedic who arrived at the scene of the offense; Jeff Greenwood, insurance claims adjuster; Linda Garcia, the daycare worker at the complainant's son's daycare; Jennifer Stockdick, Clint Stockdick's wife; Robert Michael Schrader, neighbor; Barbara Watt, neighbor; and, Laura Baum, neighbor, did not give written statements.

## Habeas court's finding no. 14 does not refer to withheld, exculpatory, or material information so it does not support the habeas court's recommendation of relief based on *Brady*.

> *Habeas Court Finding No. 14.*
> On Feb. 1, 1999, Randall Hess gave a written statement to police. He indicated that Sanders, Granthom and Towner had come to his house around 3:30 pm on January 11, 1999, looking for drugs and acting goofy as if they were already high.

67a. In Sanders' January 28, 1999 and his February 1, 1999 written statements, which were admitted into evidence at trial by defense counsel, Sanders admitted that he and Cody Ellis smoked marijuana on the afternoon of January 11TH; that Cody Towner and Michael Granthom came to Sanders' house; that Sanders, Granthom, and Towner went to Randy Hess' house about 3:50 to see if he had any "weed;" and, that they stayed there for a while talking to Hess. *See 28a, supra.*

34

68a.   During the applicant's trial, Sanders testified that he and Cody Ellis skipped 7TH period and smoked marijuana; that Sanders dropped Ellis at his house; that Sanders got home around 3:30 p.m.; that Michael Granthom and Cody Towner came to Sanders' house; that all three all three drove to Randy Hess' house about 4:20 or 4:30 to get more marijuana; and, that they stayed there about ten minutes (XXVI R.R. at 174-83).

69a.   Detective Tracy Shipley took a written statement from Randall Hess on February 1, 1999, and in Shipley's supplemental report, given to defense counsel at trial, she states that Hess "cannot be a hundred percent sure about the date and time but believed it was the same date because he had driven by Belinda Temple's house that night and observed the police at the house.  Randall stated while Joe Sanders, Michael Grantham and Cody Towner were at his house they were acting really goofy.  Randall stated, because of the way they were acting he thought they were already high."  *See Defense Writ Hearing Exhibit 3, offense report, Shipley's supplement #10, Bates Stamp 000257.*

70a.   Randall Hess' statement, the contents of which were provided to defense counsel through Detective Shipley's supplemental report, serves to corroborate Sanders' written statements and trial testimony and does not constitute withheld or exculpatory information; defense counsel was aware of the same information and any comment that Sanders and friends were acting "goofy as if

35

they were already high" is neither exculpatory nor material information in light of Sanders repeatedly admitting that he and his friends smoked marijuana that afternoon.

**Habeas court's finding no. 15, dealing with Towner and Granthom being at Sanders' house at the time of the murder and with Sosa's theory of how to muzzle the sound of a shotgun, does not constitute withheld or exculpatory or material evidence and does not support the habeas court's recommendation of relief based on *Brady*.**

> *Habeas Court Finding No. 15.*
> In January, 1999, Joe Sosa reported that on the day of the murder, Towner and Granthom were at Sander's home at the time of the murder and that if you put a pillow over the muzzle of a shotgun, it would muffle the sound.

71a.    Defense counsel was aware that Towner and Granthom were at Sanders' house the afternoon of January 11TH, and that they were moving around the neighborhood, going to Hess' house and the convenience store; such information was contained in Sanders' written statements introduced into evidence by defense counsel, so such information was not withheld and does not constitute exculpatory or material information. *See 28a, supra.*

72a.    Joe Sosa's statement about Granthom's theory that putting a pillow over the muzzle of a shotgun to muffle the sound is just that – a theory – and is neither exculpatory nor material information; there was no evidence of the

36

complainant being shot through a pillow; instead, expert testimony was elicited that the shotgun wound in the back of her head was a contact shot so that the shotgun was placed against the back of her head (XX R.R. at 140-2).

**Habeas court's finding no. 30, stating that Ryan Bruno's identity was not disclosed, is directly contradicted by the record and does not constitute exculpatory or material evidence.**

> *Habeas Court Finding No. 30.*
> Riley Joe Sanders identified Ryan Bruno's house. In one statement, he indicated nobody was home and in the other statement, that he had stayed five minutes. Bruno was never interviewed nor was his identity disclosed.

73a. In his grand jury testimony that was given to defense counsel, Sanders pointed out a mistake in his January 28TH written statement concerning going straight home from Cody Ellis' house; instead, he stopped at Ryan Bruno's house for about five minutes and spoke to Bruno for about a minute – thus, Bruno's identity was disclosed (Sanders' grand jury testimony at 13-15).

74a. During trial, Sanders testified that he stopped by Ryan Bruno's house after he took Cody Ellis home but no one was there – thus, Bruno's identity was disclosed (XXVI R.R. at 179).

75a. In his grand jury testimony that was given to defense counsel, Sanders also stated "they weren't there" and he "talked to Ryan for about, maybe, a minute" before going home (Sanders' grand jury testimony at 15).

37

76a. It is a reasonable assumption that Sanders was referring to Michael Granthom and Cody Towner when he testified in the grand jury that "they weren't there" and when he testified at trial that "no one was there," based on Granthom and Towner being friends with Ryan Bruno (Sanders' grand jury testimony at 13).

77a. Regardless, whether Sanders stayed at Ryan Bruno's for five minutes or left after finding no one there does not constitute exculpatory or material evidence based on the corroboration of Sanders' activities for the remainder of the afternoon and based on defense counsel being able to use Sanders' grand jury testimony to attempt to impeach Sanders regarding whether anyone was at home when he stopped at Bruno's house.

78a. It should be noted that Ryan Bruno died on April 6, 2003, years before the applicant was indicted in the instant offense.

**Habeas court's finding no. 21 is not supported by the record and is directly contradicted by the evidence.**

*Habeas Court Finding No. 21:*
The State misrepresented the name of Carlos Corro as Carlos Gutierrez.

79a. A subpoena dated March 30, 2005 in the court's file shows that defense counsel subpoenaed and obtained the offense report for the January 1, 1999 burglary of the Heatherington home; defense counsel was shown the subpoena during the writ hearing and was questioned about it (XXII WH at 17-8).

38

80a. During a bench conference at the applicant's trial, defense counsel referred to the L.C. Smith 12-gauge shotgun stolen during the January 1, 1999 burglary of Heatherington's home and stated that a Katy High School student who was the son of Heatherington's girlfriend and a friend named Pena were the burglars (XI R.R. at 106-7).

81a. During the same bench conference, the prosecutor noted that the defense had subpoenaed the offense report of the Heatherington burglary; that the subpoena was in the court's file; and, that Casey Goosby was the son of Heatherington's girlfriend (XI R.R. at 109).

82a. During cross-examination of Detective Leithner, defense counsel referred to Leithner's supplement #18 and elicited testimony that Casey Goosy admitted stealing Heatherington's shotgun and that Goosby knew Riley Joe Sanders, Cody Towner, Cody Ellis, and Jonathan Pena (XII R.R. at 104-5, 120).

83a. Leithner's supplement #18, given to defense counsel, states that Leithner interviewed Casey Goobsy who told him that he knew Michael Granthom, that he attended middle school with Cody Towner, Cody Ellis, Jonathan Pena and Joe Sanders; that he had known Carlos Corro for about two months; and, that Corro was a friend of Cody Ellis. *Defense Writ Hearing Exhibit 3, offense report, Leithner's supplement #18, Bates Stamp 001947-001948.*

84a.  Leithner's supplement #18, given to defense counsel, also states that Goosby admitted that he, Carlos Corro, and Cody Ellis broke several windows in Heatherington's house and that he, Carlos, and Cody went in the house and took two shotgun a couple of days later. *Id.*

85a.  Outside the presence of the jury and after defense counsel received Leithner's supplement #18, defense counsel asked Leithner, "I know this is hearsay to you, but the information you had collected from talking to Michael Granthom, Cody Towner, Cody Ellis, Jonathan Pena, Joe Sanders and Carlos Cardo (sic) and Casey Goosby was that several of them were together" the afternoon of January 11, 1999 (XII R.R. at 139).

86a.  During trial, Riley Joe Sanders testified he, Jonathan Pena, Carlos, and Cody Ellis went to a field by Carlos Carrero's house to shoot shotguns in January, 1999, and that Sanders used one of his father's shotguns (XXXVI R.R. at 197-8).

87a.  During a bench conference, defense counsel referred to Sanders' statement where he said that he knew the other shotguns they were shooting that day were stolen (XXVI R.R. at 212), and during cross-examination of Sanders in the presence of the jury, defense counsel elicited testimony that shooting the shotgun occurred days before the complainant's murder (XXVI R.R. at 217).

88a.  Outside the presence of the jury, defense counsel questioned Sanders, and *defense counsel*, not the State or Sanders, referred to Casey Goosby and Carlos

40

Guitterez (sic) breaking into Heatherington's house and stealing two shotguns (XXVI R.R. at 227-8).

89a.    Notwithstanding that Sanders' January 28TH written statement mistakenly referred to Carlos Guitterez, defense counsel was given Carlos Corro's correct name regardless of defense counsel either mispronouncing Corro's name as "Cardo" while questioning Leithner or the court reporter hearing the name wrong; defense counsel – not the prosecutor – mistakenly referred to Carlos Corro as Carlos Gutierrez while questioning Sanders even though defense counsel had Corro's correct name in writing in Leithner's supplement.

91a.  The State provided Carlos Corro's correct name to defense counsel; the habeas court's finding that the State misrepresented his name is not supported by the record; further, Carlos Corro's participation in an unrelated burglary before the complainant's death is neither exculpatory nor material to the applicant so that any mistaken references to his name do not constitute exculpatory or material information.

**Habeas court's finding no. 27, concerning the applicant's dog having access to the garage, is information possessed by the applicant, is cumulative of other evidence presented at trial, and does not constitute a *Brady* violation.**

*Habeas Court Finding No. 27:*
The State's theory was that the defendant's dog (Shaka) was in the backyard at the time of the murder.  The State did not disclose witness statements from: Jackie and Anthony Mata that

41

the dog had access to the garage; Justin Valdez that the dog had garage access and would act calm around him; and Terry Schultz that the dog had access to the garage.

92a. It is axiomatic that the applicant knew that his dog Shaka had access from the yard to the garage and from the garage to the yard through a door in the garage that opened onto the yard, so such information cannot be withheld.

93a. During the applicant's statement to Detective Leitner, the applicant did not say that he left Shaka in the garage when he left the house with his son on January 11TH, but he did state that the dog was in the back yard when he came out of the house and met the deputies after he returned and found the complainant's body, and he put the dog in the garage.

94a. During trial, the applicant testified that he left Shaka in the garage when he left the house that afternoon with his son; that Shaka was in the garage when he got home; and, that Shaka was between him, the back door and the gate when he came outside the house; and, that he put Shaka in the garage (XXI R.R. at 158, 176, 187).

95a. During trial, Deputy Johnson testified that she could not get in the applicant's backyard when she arrived at the scene because the dog was barking, growling, slamming into the fence, and continued barking after the applicant came out of the house and put the dog in the garage (IX R.R. at 79-80, 87-8).

96a. Michael Ruggiero, the defendant's neighbor, testified that he followed the applicant across the street when the applicant ran back to his house after telling Ruggiero that someone had broken in the house, but he was prevented from following the applicant into the backyard because Shaka started coming at him, jumping on the gate, and barking loudly and viciously (XVIII R.R. at 177-84).

97a. Peggy Ruggiero testified that she got along fine with the dog; that the complainant would usually pull into the driveway and stop and honk when the door was opening to tell the dog to get out of the way; and, that the dog would move to the side when the complainant honked (XXI R.R. at 139-40).

98a. Angela Vielma, a neighbor, testified that she was walking to her friend's house about 5:15 on January 11TH and saw the applicant and a little boy in a truck that passed her and parked in a garage, and that she did not see any animals when the garage door opened and she did not hear any barking (XVIII R.R. at 122-3).

99a. Brenda Lucas, the complainant's sister, testified that Shaka was never in the garage during her December 27, 1998 to January 1, 1999 visit and was never in the garage when she and the complainant left and returned to the house (XX R.R. at 195-206).

100a. The State presented testimony of nine witnesses, including neighbors, friends, and the complainant's sister, who collectively testified that Shaka

43

o was aggressive and barked ferociously and viciously if someone walked by the defendant's fence;

o was very protective of the complainant and the house;

o was approached cautiously by some friends who were afraid of the dog; and,

o was fed over the fence by one friend when he took care of the dog because he did not trust him.

(XIII R.R. at 191-3)(XIV R.R. at 126-7)(XX R.R. at 55-7, 91, 109-111, 119-21).

101a. The applicant knew that there was a door in his garage that opened onto the backyard – the same information as in the offense report stating that Shaka had access to the garage from the backyard - but such information from neighbors and/or friends does not establish that Shaka was in the garage when the applicant left the house the afternoon of the murder and when he returned.

102a. The jury was free

- to accept the applicant's testimony that he left Shaka in the garage and to view such testimony as a plausible explanation for why Shaka might not have barked at an intruder, **or**

- to accept the applicant's testimony but believe that it was likely that Shaka would have barked at an intruder in the backyard even if Shaka were in the garage, **or**

- to reject the testimony entirely.

103a. The applicant presented evidence that Shaka had access to the garage (the same information in the statements that were allegedly "withheld") and was

sometimes kept in the garage; the State cannot withhold information known to the applicant and even presented at trial by the applicant, especially in light of that information not establishing where Shaka was at the time of the offense.

**Habeas court's finding no. 2, concerning the complainant having problems with an unknown student, is directly contradicted by the record and is neither exculpatory nor material in light of the vagueness of the assertion.**

*Habeas Court Finding No. 2:*
Natalie Scott told investigators that the victim was having problems with a student and that she was worried that he knew where she lived.

104a.   During trial, Natalie Scott, neighbor, testified about her friendship with the complainant, about seeing the complainant's nursery on January 9TH, about driving by the applicant's and complainant's house around 4:30 on January 11TH and seeing nothing unusual, about driving by again around 5:30 and seeing Michael at the applicant's gate while the dog was barking, about Shaka's temperament, and about seeing the applicant at a restaurant with a blonde woman sometime after the offense (XX R.R. at 39-64).

105a.   Immediately after the prosecutor passed Scott for cross-examination, defense counsel DeGuerin asked the court, "may I have a moment to read this" and the trial court instructed the jury to take a morning break (XX R.R. at 64).

106a.   Natalie Scott gave a 3-page written statement on February 23, 1999 – the document to which defense counsel would have been referring – tracking her

testimony and also containing the following: "During a conversation with Belinda one day she had made a comment about living in the same attendance zone as where she lived. <u>She did not mention any one kid in particular. I don't remember her ever saying she was afraid of any of the kids</u>." *See Defense Writ Hearing Exhibit 3, Temple Appendix 1 DVD, Scott's statement, Bates Stamp 851 (emphasis added).*

107a. According to the supplemental report of Detective Brown, he spoke with Natalie Scott on January 11TH and Scott advised him that she got home around 4:30 and left again around 5:15; that she saw Mike Ruggiero standing at the applicant's gate when she returned between 5:30 and 5:40; that she stopped her car and Ruggiero told her someone had broken into the applicant's house; and, that she did not know of any marital problems between the applicant and the complainant. *See Defense Writ Hearing Exhibit 3, offense report, Brown's supplement, Bates Stamp 000049.*

108a. Scott's January 11TH oral statement was not given to counsel because Detective Brown, the officer who made the report, did not testify; however, her January 11TH oral statement did not contain any information about a student or the complainant being afraid of a student. *Id.*

109a. According to the supplemental report of Investigator Page, he spoke with Natalie Scott on January 12TH and she "stated that the complainant had

46

mentioned that she was concerned about some students at her School knowing where she lived." *See Defense Writ Hearing Exhibit 3, offense report, Page's supplement, Bates Stamp 000102.*

110a. Detective Mark Schmidt's supplement #19, given to defense counsel when Schmidt testified at trial before Natalie Scott testified, noted that Schmidt had reviewed Page's supplement where "Page had noted that when he spoke to Mrs. Scott she stated that Belinda Temple had expressed a concern regarding students knowing where she lives." *See Defense Writ Hearing Exhibit 3, offense report, Schmidt's supplement #19, Bates Stamp 000297-000298.*

111a. Detective Schmidt's supplement #19 also notes that he "asked Mrs. Scott if Mrs. Temple had expressed a concern over students knowing where she lives. Mrs. Scott states she and Belinda were talking one day, the topic of students knowing where she lives was a general statement to the effect of 'I don't like my students knowing where I live.' Mrs. Scott states Belinda had never mentioned any student by name and had not told her of a particular student she feared." *Id. (emphasis added).*

112a. Detective Schmidt's supplement #20, given to defense counsel when Schmidt testified at trial before Scott testified, notes that he met with Natalie and Glenn Scott on February 23, 1999; that "Mrs. Scott recalled a conversation with Belinda Temple. Belinda had commented about living in the same attendance

zone. Belinda had not mentioned any kid in particular. She does not remember Belinda saying she was afraid of any of the kids." *See Defense Writ Hearing Exhibit 3, offense report, Schmidt's supplement #20, Bates Stamp 000308 (emphasis added).*

113a. In both Natalie Scott's written statement, given to defense counsel, and in Detective Schmidt's supplements, also given to defense counsel, Scott noted that in another conversation the complainant said that she had told "Joey's" parents about broken glass on her property after a party or drinking in Joey's driveway and Joey got in trouble – an event of which defense counsel was aware and about which he questioned Riley Joe Sanders (XXVI R.R. at 219).

114a. Contrary to habeas court's finding no. 2, Natalie Scott did <u>not</u> tell investigators that the complainant was "having problems with a student" and Scott did not tell investigators that the complainant was worried that "he" knew where she lived; the habeas court's finding does not accurately portray what was said; regardless, defense counsel was aware of Scott's comments concerning the conversation.

**Habeas court's findings nos. 1, 4, 6, 11, 12, and 13, concerning the shotguns recovered after the offense, do not support the finding that the State withheld *Brady* evidence or the conclusion and recommendation that the applicant receive a new trial.**

*Habeas Court Finding No. 1:*
The report prepared by Dep. Hernandez concerning recovery of the H & R shotgun was lost, destroyed or never prepared, showing when, how, where and from whom the weapon was obtained.

*Habeas Court Finding No. 4:*
Cody Ellis was interviewed on Jan. 14, 25 and 28, 1999 and Feb. 10, 1999. On the last occasion he was administered a polygraph test. He never mentioned that he was in possession of Sander's H & R shotgun. Although known to law enforcement, Ellis was never questioned about his hiding the H & R shotgun, later recovered with a spent reloaded .00 buckshot shell still in the chamber; how the weapon came to be wrapped in a blood spotted towel; and the circumstances under which the H & R shotgun left Ellis' possession.

*Habeas Court Finding No. 6:*
On August 25, 2005 at a discovery hearing, the defendant requested all "documentation of leads of other suspects." The Judge ordered disclosure of "any reports, documentation which reports tips, leads as to another person having committed this offense, that's Brady material." The trial prosecutor informed the Court that the police had checked out all of the calls and nothing came of those efforts. Relying on the statement of the prosecutor, the Court denied the request. At that same hearing, the trial prosecutor informed the Court that the weapons recovered had nothing to do with the murder; that they were the wrong type of weapons; and the wrong type of ammunition. Finally, the trial prosecutor told the Court that there was no evidence favorable to the defense even though Mrs. Cain had called law enforcement stating that her husband may have killed the victim. The Cain information was disclosed October 4, 2007, just 11 days prior to the beginning of trial.

*Habeas Court Findings No. 11:*
On January 28, 1999, Cody Ellis give police a written statement. He did not reveal nor was he asked about his possession of the H & R shotgun. The written and oral statements were never disclosed.

*Habeas Court Finding No. 12:*
Jonathon Pena gave police a written statement indicating he was present at Casey Goosby's home when Goosby, Cody Ellis and Carlos Corro planned the Heatherington burglary; that shortly thereafter, Riley Sanders brought his H & R shotgun from home to go shooting with them; and Cody Ellis told him later that he was keeping Sanders shotgun under his bed.

*Habeas Court Finding No. 13:*
On Feb. 1, 1999, Carlos Corro gave a written statement to police that he was aware Cody Ellis had been hiding Sander's shotgun under his bed and that he had participated in the Heatherington burglary.

115a. A review of the August 25, 2005, the October 4, 2007, and the October 11, 2007 pre-trial hearings, shows that defense counsel was aware of the shotguns recovered during the investigation and the testing results prior to trial (IV R.R. at 52, 55-6)(VI R.R. at 9-14)(VIII R.R. at 5).

116a. The following shotguns were recovered and tested during the investigation:

| SHOTGUN | OWNER | RECOVERED |
|---|---|---|
| L.C. Smith 12-gauge | H. R. Heatherington (stolen from him in burglary committed by Casey Goosby, Carlos Corro and Cody Ellis) | Near VFW Park on 1/15/99 |
| Winchester 12-gauge | H. R. Heatherington (stolen from him in same burglary) | 1254 FM 1463 on 2/1/99 |
| Beretta 12-gauge with a shortened barrel | Tim Tangney | In field behind Kroger's at 1721 N. Fry Rd. on 6/21/99 |

| | | |
|---|---|---|
| Diawa 12-gauge | Joe Sanders, Riley Joe's father | Received from Joe Sanders on 2/1/99 |
| H&R 12-gauge | Joe Sanders | Recovered by Deputy Hernandez on 1/28/99 |
| Remington 12-gauge | Kathryn Cain's deceased husband | Received from Cain on 11/11/04 |

117a.    During trial, the following evidence was elicited concerning the recovered shotguns and shells:

- that lead projectiles and a plastic wadding were recovered from the complainant's autopsy (X R.R. at 122); that shotgun pellets, lead fragments, and wadding were recovered from the crime scene (IX R.R. at 74-6); and, that all were submitted to the Harris County Sheriff's firearm examiner for testing (X R.R. at 122-9);

- that four lead fragments and wadding disk recovered from the crime scene and three lead fragments and plastic wadding recovered from the autopsy (XX R.R. at 153-4) were submitted to an outside lab for testing (X R.R. at 130);

- that all recovered shotguns were tested for the presence of blood, brain matter, and glass and none were found (XXVI R.R. at 128);

- that a 12-gauge L.C. Smith shotgun belonging to H.R. Heatherington was recovered near the Katy VFW on January 15, 1999, and that the shotgun was stolen by Casey Goosby, the teenage son of Heatherington's girlfriend, and his friends Cody Ellis and Carlos Corro (XI R.R. at 104)(XII R.R. at 99-103)(XXIV R.R. at 78);

51

- that a Winchester 12-gauge shotgun belonging to H.R. Heatherington was recovered on February 1, 1999 (XXIV R.R. at 79);

- that before the complainant's murder, Riley Joe Sanders took his father's H&R shotgun and went out shooting with Cody Ellis and Carlos Corro; that Ellis and Corro shot the shotguns stolen from Heatherington; and, that Sanders gave his father's H&R shotgun to Cody Ellis to keep at Ellis' house because Sanders did not want his father to know he had taken the H&R shotgun (XXVI R.R. at 195-200);

- that the H&R 12-gauge shotgun containing spent double-ought buckshot and belonging to Sanders' father was recovered on January 28, 1999 (XXIV R.R. at 78-9);

- that a 12-gauge Daiwa shotgun and some 12-gauge reloads belonging to Sanders' father were recovered on February 1, 1999 (XXIV R.R. at 79);

- that about 20 to 25 double-ought buckshot shells were recovered from Sanders' father (XXIV R.R. at 80);

- that a weathered Beretta 12-gauge shotgun with a shortened barrel was recovered from a field in the Katy area in May, 1999 (XVIII R.R. at 44-7); and,

- that a Remington 12-gauge shotgun belonging to the deceased husband of Kathryn Cain was recovered in 2004 (XVIII R.R. at 84-5)(XXI R.R. at 179-80);

118a. During the defendant's trial, the defense expert concluded that:

- none of the examined shotgun shells had double-ought shot or wadding consistent with the evidence wad (XXV R.R. at 38);

52

- none of the double-ought buckshot shells [recovered from Joe Sanders] were loaded and/or re-loaded with double-ought buckshot – the type of ammunition used to kill the complainant – and none of the wadding [from Sanders' shotgun shells] was consistent with the wadding found at the crime scene (XXV R.R. at 39);

- that none of the shotgun shells [recovered from Cain] were reloads and only the shell cartridges themselves were double-ought buckshot (XXV R.R. at 35);

- none of the shells recovered from anywhere in Harris County matched what was found at the crime scene (XXV R.R. at 39); and,

- that defense expert was provided copies of Harris County reports and the reports of any other lab that handled the firearms and none of the shotguns had blood or glass found on them (XXV R.R. at 41).

119a. Defense counsel was aware prior to trial that Casey Goosby stole Heatherington's shotguns, based on the following:

- A subpoena dated March 30, 2005 in the court's file shows that defense counsel subpoenaed and obtained the offense report for the Heatherington burglary; reference was made to the subpoena during a conference outside the presence of the jury (XI R.R. at 109).

- During Riley Joe Sanders' testimony, defense counsel presented a bill of exception that, on January 5TH, Cody Ellis told Sanders that he, Casey Goosby, and Carlos Gutierrez (sic) had broken into the home of Goosby's mother's boyfriend (Heatherington) during the holidays and stole two shotguns (XXVI R.R. at 228).

- In the presence of the jury, defense counsel elicited testimony that Ellis, Goosby and Gutierrez (sic) told Sanders shortly before the complainant's murder about burglarizing the house

53

and stealing two shotguns, and defense counsel also elicited testimony that Sanders, using his father's H&R shotgun, went shooting with them when they shot the stolen shotguns (XXVI R.R. at 234).

120a. During trial, defense counsel questioned witnesses, introduced exhibits, made statements to the trial court outside the presence of the jury, and presented a bill of exception showing that he was aware of the evidence concerning the recovered shotguns, where and/or from whom the shotguns were recovered, the results of testing, the identity of the persons who stole Heatherington's shotguns, Riley Joe Sanders giving the H&R shotgun to Ellis to keep for him so that Sanders' father would not know that he had taken the gun, the H&R shotgun being wrapped in a towel with bloodstains when recovered, and the DNA testing of the stains excluding the defendant and complainant.

121a. Notwithstanding any assertion that the prosecutor did not consider the recovery of Kathryn Cain's husband's shotgun exculpatory, i.e., *Brady*, based on the incredibility of Cain, the prosecutor informed defense counsel of the recovery of Cain's shotgun during a pre-trial hearing, the gun was tested and found not to be the murder weapon, defense counsel presented Kathryn Cain as a witness at trial, and Cain testified that she gave shotgun shells to defense investigator Ralph Warren – showing that defense counsel was aware of the information and investigated the information even though it was not exculpatory (XXI R.R. at 178-181).

122a. As the defense expert concluded, none of the shotguns recovered and listed in the habeas court's findings matched the recovered shotgun evidence; none were the murder weapon; thus, where they had been and with whom does not constitute exculpatory information.

**Habeas court's findings nos. 19 and 20 do not consist of exculpatory evidence and the information in habeas court's finding no. 19 is strikingly similar to information known to defense counsel.**

> *Habeas Court Finding No. 19:*
> On January 12, 1999, Dennis Hundle is interviewed. Not disclosed were his statements that on January 11, 1999, after 2 p.m. he sees 2 white males in their 20's in a truck driving around the neighborhood and it appeared they had no destination.
>
> *Habeas Court Finding No. 20:*
> In March, 1999, Corro is arrested with Ellis and Goosby doing "donuts" on the green belt in Katy, Texas and one was driving a white truck.

123a. In Detective Leithner's supplement #7, given to defense counsel, the applicant's father told Leithner that Michael Ruggiero mentioned seeing a white car with two white males wearing baseball caps. *See Defense Writ Hearing Exhibit 3, Leithner's supplement #7, Bates Stamp 001920.*

124a. It should be noted that Dennis Hundle did <u>not</u> state that he saw a white truck in the neighborhood; further, white males driving through a populated residential area at an unspecified time on the day of the offense in either a white

truck or white car or any color car or truck does not consist of exculpatory evidence; there is no connection to the complainant's murder or to the applicant's guilt or innocence. *See Bates stamp 97.*

125a. The fact that either Carlos Corro, Cody Ellis, or Casey Goosby was driving a white truck two months after the offense is not exculpatory to the applicant nor does it establish a connection to the complainant's murder; many trucks are driven in Katy, a semi-rural suburb, and it is likely that many of them are white trucks.

**Habeas court's finding no. 7, information about the Parkers' dog, is neither exculpatory nor material; it is not reasonably probable that the results of the proceeding would have been different if defense learned about the Parkers' dog earlier.**

> *Habeas Court Finding No. 7:*
> Although required to disclose by the Court, the trial prosecutor did not disclose evidence of the Parker's dog barking near the time of the murder. This information was gained by the defendant on October 16, 2007 after the first witness had testified.

126a. During cross-examination of the State's first witness, Deputy Virginia Johnson, defense counsel refreshed the deputy's recollection with her offense report, saying that it showed that she interviewed Jim Parker, a neighbor, who heard "a" dog barking between 4:30 and 4:45 (IX R.R. at 98).

127a. The portion of the offense report to which defense counsel referred states that Jim Parker heard <u>his</u> dog barking in the backyard, not that he heard "a" dog barking. *See Defense Writ Hearing Exhibit 3, offense report, Johnson's supplement, Bates Stamp 000019.*

128a. During a bench conference after Deputy Johnson's testimony, defense counsel argued that the prosecutor had been ordered to give the defense any information that would establish the time of the shooting and that "that's exactly when we think the shooting occurred" - when the dog barked (IX R.R. at 115).

129a. The prosecutor responded that she was to provide information having to do with the time of the shooting and just because a dog (not the applicant's dog) was barking did not mean that was the time of the shooting; there was also information that a dog barked at a meter reader around noon but that had nothing to do with the shooting (IX R.R. at 116-7).

130a. During cross-examination of Detective Dean Holtke, defense counsel asked about reports from neighbors about "dogs" barking between 4:30 and 4:45 (XI R.R. at 74).

131a. During cross-examination of Detective Charles Leithner, defense counsel asked if one of the reasons for the neighborhood canvass was to determine if anyone heard a dog barking and if there was "a follow-up examination, at least on hearing dogs bark, with the Parker family" (XII R.R. at 138).

132a. During cross-examination of Detective Mark Schmidt, defense counsel asked whether there was an effort to find people in the neighborhood who might have heard a dog barking and whether Schmidt interviewed "the Parkers who share parts of the fence" with the applicant's home (XIII R.R. at 149).

133a. During the defense's case-in-chief, Jim Parker testified that his dog Sheba was really excited and running up and down the fence when he got home around 4:30; that he told officers later that night about his dog barking at the back fence around 4:30; and, that his backyard was kitty-corner to the applicant's (XXI R.R. at 98, 102-4).

134a. During the defense's case-in-chief, Cynthia Parker testified that she got home around 4:00 and their dog was going crazy in the back yard, running the fence line and barking around 4:20 or 4:25, but she was just estimating the time (XXI R.R. at 108-9, 111-2).

135a. During the writ hearing, defense counsel DeGuerin testified that he spoke to the Parkers at least twice on the phone; defense counsel's file contained transcripts of the phone conversations (V WH at 201-2)(XXIII WH at 83). *See also Defense Writ Hearing Exhibits 117, 117a, 117b, transcripts of calls.*

136a. Defense counsel DeGuerin was able to effectively present all information concerning the Parkers' dog barking and the time of barking during

trial, so the jury was aware of the evidence and could have chosen to view it as beneficial to the applicant if the jury chose to do so.

137a. During the writ hearing, prosecutor Seigler testified that she believed the trial court's October 4, 2007 order concerning disclosure of barking dogs referred to the defendant's dog Shaka; regardless of the prosecutor's belief, defense counsel was able to present the information concerning the Parkers' dog in full to the jury (IX WH at 227-33)(X WH at 276-7).

138a. Information that the Parkers' dog barked at an estimated time is neither exculpatory nor material in light of the fact that the dog could have been barking for any number of unknown reasons and a neighbor's dog barking for an unknown reason does not establish the time of the shooting.

**Habeas court's findings nos. 5 and 22 are directly contradicted by the record, and habeas court's findings nos. 5, 22, 23, 24, and 25, concerning teachers' audiotaped interviews, do not show that the contents of such interviews were exculpatory and/or material so that it is reasonably probable that the results of the proceeding would have been different.**

*Habeas Court Finding No. 5:*
Recorded oral statements of Margaret Christenson (sic) and Stacy Ferguson, both of which saw the victim in the school parking lot shortly before her murder.

*Habeas Court Finding No. 22:*

59

The State did not disclose the statement of Margaret Christian (sic) who saw the victim talking to the defendant on her cell phone between 3:20 and 3:30 p.m. on the day of her murder.

*Habeas Court Finding No. 23:*
Det. Shipley repeatedly omitted favorable defense facts from her offense reports when she documented "synopses" of audio statements.

*Habeas Court Findings No. 24:*
The main prosecutor denied ever having seen or listened to these audio recordings when in fact she was aware of them and had listened to them.

*Habeas Court Finding No. 25:*
The State did not disclose the identity of Denise Levaris who could have confirmed seeing the victim in the parking lot after school which would have helped the defense timeline.

139a. During trial, Margaret Christen, assistant principal at Katy High School, testified the complainant came to her office around 2:30 or 2:35 to attend a meeting with other teachers on January 11, 1999, and that the meeting ended about 3:20 or 3:30 but Christen did not know when the complainant left the school (XV R.R. at 171-5).

140. Detective Shipley's supplement, given to defense counsel at trial, states that she borrowed a tape recorder at the high school – hers was broken – to record the oral statements of the interviews of teachers Margaret Christian (sic) and Courtney Ferguson, among others – and Shipley noted that a transcript of the tapes were not made but could be done at a later date if necessary. *Defense Writ*

60

*Hearing Exhibit 3, offense report, Shipley's supplement, Bates Stamp 000134-000136.*

141a. In her audiotaped interview prior to trial, Christen stated that the meeting was scheduled for 2:40 and began at 2:50; that the complainant left Christen's office between 3:20 and 3:30; that Denise Levaris and Courtney Ferguson walked out at the same time; that Christen did not know what time the complainant left the school; and, that, from what other people said, the complainant made a phone call to the applicant, but it is unclear whether Christen was referring to the complainant calling the applicant earlier about Evan being ill or about the complainant calling after the meeting ended. *See Defense Writ Hearing Exhibits 178 and 180, audiotaped interviews.*

142a. Contrary to the habeas court's finding no. 5, Margaret Christen did not state, in her audiotaped interview, that she saw the complainant in the school parking lot shortly before the murder, and Christen did not state that she saw the complainant talking to the applicant on her cell phone between 3:20 and 3:30 on the day of her murder. *Id.*

143a. Margaret Christen's audiotaped interview and her trial testimony were consistent concerning when the complainant left her office – between 3:20 and 3:30 – and concerning the fact that she did not see when the complainant left the school.

144a. In her audiotaped interview prior to trial, teacher Courtney Ferguson stated that the complainant walked out of the school behind "us;" that they joked about how big the complainant was at Denise's car; and, that Ferguson saw the complainant drive away. *Id.*

145a. Ferguson did not testify at trial and, during her audiotaped interview, Ferguson did not cite any time that the complainant left the school or mention the complainant making a phone call. *Id.*

146a. During the applicant's trial, Charles Kenneth Temple, the applicant's father testified that the complainant arrived at his house a couple of minutes past 3:30; that she left at 3:45; and, that it usually takes about fifteen minutes to drive from his house to the applicant's house (XXII R.R. at 49-53).

147a. The applicant testified that the complainant called him on her way to the Temple house and that she arrived home around 4:00 p.m. (XXV R.R. at 151, 172).

148a. During the applicant's trial, evidence was presented that the complainant's cell phone records showed a call at 3:32 p.m. to the applicant's home phone (XII R.R. at 210).

149a. The information in Christen's audiotaped statement that, from what other people said, the complainant made a phone call to the applicant was

presented to the jury through the complainant's cell phone records, rather than a hearsay statement from Christen.

150a.  The time the complainant left the meeting was established through the trial testimony of Margaret Christen; the time the complainant called the applicant at home was established by cell phone records; the time the complainant arrived home was set by the applicant's testimony.

151a.  Contrary to the habeas court's finding no. 25, the identity of Denise Levaris, who saw the complainant in the parking lot after school along with Courtney Ferguson, would not have helped the defense timeline – a timeline set by cell phone records, the applicant's father and the applicant.

152a.  The prosecutor's writ hearing testimony, given eight years after trial, that she did not see or listen to these audiotapes, goes to her recollection of past events – just as defense counsel did not recollect that he was provided the FBI profile even though his own tape recording of a phone call shows that he was informed of the profile and given access to the profile.

153a.  Regardless, the audiotaped interviews of Margaret Christen and Courtney Ferguson do not constitute exculpatory, much less material, evidence in light of other evidence setting the time the complainant called the applicant and the time the complainant arrived home.

154a. The applicant fails to show that Detective Shipley omitted "favorable defense facts" from her offense reports when she summarized the audio statements.

**Habeas court's finding no. 26, concerning Joe Cadena hearing a backfire, was information given to defense counsel.**

*Habeas Court's Finding No. 26:*

On January 25, 1999, Joe Cadena was interviewed by law enforcement and told them that around 4:25-4:30 p.m. he heard what sounded like a backfire from a car on the day of the murder.

155a. According to Detective Tracy Shipley's offense report, given to defense counsel, she canvassed the neighborhood and spoke to Joe Cadena who stated that he usually got home by 4:00 p.m.; that he was cleaning out his garage and heard what he thought was a firecracker or a vehicle backfiring twice at approximately 4:30 to 5:30 p.m.; that he turned around and saw an older white truck on Hidden Canyon; and, that he thought it was the truck. *Defense Writ Hearing Exhibit 3, offense report, Detective Shipley's supplement, Bates Stamp 000052.*

156a. On January 15, 1999, Cadena gave a written statement in which he described the noise he heard at approximately 5:00 p.m. while in his garage as a "loud pop;" that he thought the noise a backfire from a truck at the stop sign at Hidden Canyon; that he heard a second pop approximately 3-5 seconds after the first pop when the truck was pulling away from the stop sign; and, that he assumed

the noise was a backfire from the truck. *See Defense Writ Hearing Exhibit 3, Temple Appendix 1DVD, Cadena's statement, Bates Stamp 802.*

157a. During the writ hearing, defense counsel DeGuerin testified that defense investigator Ralph Warren did a canvass of the neighborhood and spoke to Joe Cadena in 2005, and that the prosecutor "kept telling me that Joe Cadena said there was two backfires" (V WH at 178)(XXII WH at 143-4)(XXIII R.R. at 55).

158a. The State did not withhold Cadena's information; defense counsel's investigator interviewed Cadena in 2005 – two years before trial - and the State provided defense counsel Detective Shipley's offense report at trial that included the contents of Cadena's oral statement that tracked his written statement concerning hearing what he thought was backfire.

159a. Assuming *arguendo* that the noises Cadena heard were considered gunshots, then the occupants of the white truck he saw could not be linked to the offense because Cadena heard the noises within seconds of seeing the truck – rendering it impossible for the occupants to be in the complainant's home at the time Cadena heard the backfires.

**Habeas court's findings nos. 33, 34, 35, and 36, all of which concern alleged events years _after_ the applicant's trial, are unsupported and do not constitute exculpatory evidence or any type of evidence that prevented the applicant from receiving a fair trial.**

*Habeas Court Finding No. 33:*
After conviction, the State's main prosecutor instructed law enforcement and District Attorney Officials not to disclose records pursuant to an Open Records Request. Disclosure was made only after these writ proceedings were initiated.

*Habeas Court Finding No. 34:*
Years after leaving the District Attorney's Office, the lead trial prosecutor learned that Glasscock had approached Dick DeGuerin. She then contacted a Sheriff's Deputy involved in the trial investigation and asked him to contact Glasscock and another witness before they could be contacted by the Special Prosecutor or current members of the District Attorney's Office. The Deputy did so and afterwards, their stories were significantly different than the original version.

*Habeas Court Finding No. 35:*
Additionally, long after leaving the District Attorney's Office, when the original trial prosecutor learned of the newly discovered evidence investigation by the Special Prosecutor, she personally obtained representation for Riley Joe Sanders from two very talented criminal defense lawyers, Mac Secrest and Chip Lewis.

*Habeas Court Findings No. 36:*
After the trial, the lead prosecutor Kelly Siegler ran for District Attorney against Pat Lykos and lost. After her defeat, she left the District Attorney's Office but through friends who remained on the staff, learned that Dick Deguerin had brought the Glasscock information to the new District Attorney for further investigation. A Special Prosecutor was appointed and faced significant difficulty in investigating the validity of Glasscock's claim.

160a. On November 19, 2007, the applicant was sentenced to life in prison; on November 20, 2007, the prosecutor was informed of an Open Records request made to the Harris County Sheriff's Office by the television show "Inside Edition"

for copies of all emergency audio recordings; all incident reports, any video footage or photographs, and emails from Heather Scott to the applicant. *See Defense Writ Hearing Exhibit 115, emails.*

161a. The prosecutor replied by email on November 20, 2007, stating that the defense saw only what they were entitled to see, and the General Counsel emailed the County Attorney's Office on November 20, 2007, stating that "per Kelly, please make sure that Lt. Martin limits disclosure only to those matters that were actually admitted at trial." *Id.*

162a. A May 31, 2012 email to Alan Curry, Harris County District Attorney's Office, states that "Brian [Rose] wanted to let you know that he's pulling some of the David Mark Temple files from your office to show to Stanley Schneider [habeas counsel] who showed up unannounced to review the files this afternoon." *See Defense Writ Hearing Exhibit 29, May 31, 2012 email.*

163a. An August 25, 2012 memo to the file from Assistant District Attorney Brian Rose states:

> Stan Schneider is now representing David Temple along with Dick DeGuerin. Stan has been reviewing the District Attorney's file with me per the instruction of First Assistant Jim Leitner. He now has received from me a full copy of the offense report and also copies of all grand jury testimony transcripts (12 I believe). The production of the grand jury material was done pursuant to a court order that was authorized by Jim Leitner.

*State's Writ Hearing Exhibit 47, August 25, 2012 memo.*

164a. The applicant's motion for leave to file an original writ with the Court of Criminal Appeals was filed on October 10, 2012; the applicant's instant 11.07 habeas writ was filed on April 7, 2014; thus, contrary to habeas court's finding no. 33, disclosure of the records was made to habeas counsel at least two years before the instant writ proceedings were initiated.

165a. The prosecutor's request that only documents admitted at trial be released to the media was made a day after the completion of the trial prior to the applicant's conviction being final and did not involve or affect habeas counsel and did not prevent disclosure of the State's file to habeas counsel *prior* to the applicant's writ being filed. *See also Defense Writ Hearing Exhibit 34, November 30, 2007 email re media request made before conviction final.*

166a. The prosecutor, as a private citizen after leaving the employ of the Harris County District Attorney's Office, was aware that the defense theory was that Riley Joe Sanders had allegedly committed the offense; thus, she was free to refer Sanders to attorneys to represent him; such referral had no effect on the applicant's 2007 trial and is not a *Brady* violation.

167a. Eric Clegg, Harris County Sheriff's Office cold case unit, and Robert Minchew, Harris County Sheriff's Office cold case unit, talked with Daniel Glasscock on September 26, 2012, and Glasscock admitted that many of the things he initially said in his deposition with counsel DeGuerin and habeas counsel were

not true. *See Joint Writ Hearing Exhibit 1, Minchew affidavit; Joint Writ Hearing Exhibit 2, Minchew affidavit; State's Writ Hearing Exhibit 52, Minchew's supplement; State's Writ Hearing Exhibit 78, transcript of Glasscock's statement; Defense Writ Hearing Exhibit 135, Minchew's supplement.*

168a. Detective Holtke, with whom the prosecutor spoke, did not interview Glasscock during the habeas investigation; Holtke spoke with Cody Ellis during the habeas investigation but Ellis did not "change his story" (XVIII WH at 88, 102-4, 116, 148, 188). *See State's Writ Exhibit 49, Holtke's supplement; Defense Writ Hearing 137, cd recording of Ellis.*

169a. Any difficulties the Special Prosecutor had in investigating the validity of the claim involving Glasscock can be traced to the lack of merit of the claim – not to the former prosecutor – and did not affect the applicant's due process he received at trial and cannot be construed as some type of *Brady* violation.

## MISTAKENLY ADDED FINDING NO. 37 AND WITHDRAWN FINDING NO. 37

170a. On August 20, 2015, habeas counsel Stan Schneider and Casey Gotrow sent an email to Judge Gist – the habeas court for the purpose of the writ proceedings – and asked him to consider entering amended findings and conclusions of law.

171a. On August 21, 2015, the habeas court replied to the email stating, "I will review the submittal and advise all parties whether or not I will grant the defendant's request over the State's objection. However, I will not add additional fact findings."

172a. On September 2, 2015, the habeas court filed amended Findings of Fact and Conclusions of Law and the habeas court's cover letter stated, "This is identical to the original filed in the Court with the addition of citations to the record regarding each finding."

173a. However, a review of the amended Findings of Fact show the addition of a new finding – no. 37. On September 4, 2015, the State emailed both habeas counsel and the habeas court asking about the addition of finding no. 37 in light of habeas court's statement that the court would not add additional findings and that the habeas court was filing amended findings that were identical to those formerly filed – findings that were numbered 1 through 36 and did not include finding no. 37.

174a. On September 8, 2015, the habeas court sent a letter to the Court of Criminal Appeals stating that the habeas court, i.e., Judge Gist, "**never made finding No. 37 and do not make such a finding now**." The habeas court further requested that the Court of Criminal Appeals "**please delete finding No. 37 from the document recently sent to you**."

## OBJECTIONS TO CONCLUSIONS OF LAW

1b. As shown above, the applicant was aware of the following prior to trial: the FBI profile; the defense alternate suspect theory concerning Riley Joe Sanders; Sanders' skipping school the afternoon of the offense; the recovery and results of the testing of the shotguns; the Heatherington burglary; the time the complainant returned home as set by the applicant; Shaka's nature; Shaka's access from the garage to the yard; Joe Cadena, the neighbor who heard noise he interpreted as backfire from a truck; the information from the Roberts' children; and, the applicant's own emotional response at the scene. The applicant fails to show a *Brady* violation. *Brady v. Maryland,* 373 U.S. 83 (1963)(holding defendant must show State suppressed evidence favorable to accused where evidence is material either to guilt or punishment); *see also Ex parte Russell,* 738 S.W.2d 644, 646 (Tex. Crim. App. 1986)(holding State cannot suppress information defendant possesses).

2b. As shown, above, the applicant was properly given the oral statements of witnesses during trial before they testified via the supplement reports of testifying officers and defense counsel was allowed time to review the reports; defense counsel was also given the information about the Parkers' dog barking, the contents of Sanders' January 11TH, January 14TH and February 1ST oral statements,

71

the contents of Sanders' two written statements and his grand jury testimony, the results of the polygraph exams, the correct name of Carlos Corro, the activities of Sanders' and friends on the day of the offense; Natalie Scott's oral statement concerning her conversation with the complainant where the complainant stated she did not like students knowing where she lived; and, information that the oral statements of the teachers were tape-recorded. *See* TEX. R. EVID. 612 and 615 (after witness other than defendant has testified on direct exam, the court, on motion of other party, shall order production of statement of witness that relates to subject matter to which witness has testified); *see also Temple v. State,* 342 S.W.3d 572, 592 (Tex. App.-Houston [14TH Dist.] 2010, pet. granted)(holding defendant did not establish reasonable probability that outcome of trial would have been different if State disclosed facts about Sanders earlier; holding that, even if defendant has preserved *Brady* complaint concerning alleged non-disclosure of information about Sanders and defendant's complaint that the trial court erred in deny motion for continuance based on alleged non-disclosure, excluding information about Sanders' polygraphs, the jury was presented with remainder of facts set out in counsel's motion for continuance; defense counsel emphasized the facts through methodical series of questions during defendant's testimony, thoroughly cross-examined Sanders, and focused on Sanders' alleged witness, and focused on Sanders' alleged participation in offense during guilt-innocence

argument)(citing *Shpikula v. State,* 68 S.W.3d 212, 220 (Tex. App.-Houston [1ST Dist] 2002, pet. ref'd)("If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might or should have been."));[7] *see also Little v. State,* 991 S.W.2d 864 (Tex. Crim. App. 1999)(holding that late disclosure at trial that testifying chemist had misplaced paper records of test did not prejudice defendant because defense counsel was able to use this information during cross-exam to attempt to impeach chemist; holding defendant must show prejudice by establishing that counsel was not able to make effective use of new information).

3b. As shown above, the information listed in habeas court's findings was either not supported by the record, was directly contradicted by the record, was information known to defense counsel prior to trial, was properly produced during trial, and/or was not material. For example, the State did not withhold the time of the murder – a time never established; Natalie Scott did not state that the complainant told her she was afraid of a student; a neighbor seeing a white truck *at the same time or within seconds* after the noise he interprets as backfire does not and cannot link the unknown occupants of the white truck with the offense; and, Carlos Corro's arrest in a white truck months after the offense is neither

---

[7] Thus, the applicant's complaint concerning Riley Joe Sanders has been raised and rejected on direct appeal; therefore, it need not be considered in the instant habeas application or subsequent applications. *See Ex parte Acosta,* 672 S.W.2d 470, 472 (Tex. Crim. App. 1984)(holding that reviewing court need not address previously raised and rejected issues).

exculpatory nor material. *See United States v. Agurs,* 427 U.S. 97 (1976); *United States v. Bagley,* 473 U.S. 667 (1985)(holding evidence is material where there is reasonable probability that, if disclosed, result of proceeding would have been different); *Pena v. State,* 353 S.W.3d 797, 810 (Tex. Crim. App. 2011)(noting State does not have duty to disclose evidence if defense actually was aware of evidence or could have accessed it from other sources); *see and cf. Harm v. State,* 183 S.W.3d 403, 407 (Tex. Crim. App. 2006)(noting that *Brady* and progeny does not require prosecutor to disclose exculpatory information known to defense that State does not have in its possession and that is not known to exist).

4b. The information given by Margaret Christen and Courtney Ferguson in the audiotaped interviews – which were noted in supplements provided to defense counsel - could have been obtained by defense counsel with reasonable effort; regardless, such information was not exculpatory concerning the defense timeline because such times were established by the complainant's cell phone records, the testimony of the applicant and the testimony of the applicant's father – to argue differently concerning the time would have meant that defense counsel was impeaching his own client and witness. *See and cf. Williams v. Scott,* 35 F.3d 159, 163 (5TH Cir. 1994)(holding *Brady* violation does not arise if defendant could have obtained information with due diligence; holding *Brady* not violated where

prosecutor gave defense summary of witness's statement – who did not testify at trial – that included cross reference to her written statement).

5b. The information given by Riley Joe Sanders in his January 12TH and January 25TH oral statements, not given to defense counsel because the officers taking the statements did not testify, was cumulative of the information in his other produced statements, was already known to defense counsel, i.e., that Sanders skipped school, was not exculpatory, and/or was not material, i.e., it is not reasonably probable that a different result would have been reached if known. *See Agurs,* 427 U.S. at 110 (holding that mere possibility undisclosed information might have helped defense or might have affected outcome of trial does not establish materiality)..

6b. The tenor of the questions asked during the inadmissible polygraphs examinations was contained in Detective Leithner's supplement reports given to defense counsel; regardless, counsel was aware of the results of the polygraphs given to Sanders, Michael Granthom, Cody Towner, and Cody Ellis in which none admitted culpability, and the exact questions asked in the inadmissible polygraph exams would not have probably resulted in a different trial result if known especially in light of defense counsel's thorough assault on Sanders' at trial – as noted by the Court of Appeals in its opinion on direct appeal. *Id.; see also Ex*

*parte Miles,* 359 S.W.3d 647, 665 (Tex. Crim. App. 2012)(requiring evidence central to *Brady* claim be admissible in court).

7b. Any report, if made, by Deputy Hernandez involving the details of recovering the H&R shotgun showing that Cody Ellis turned over the H&R shotgun – used by Sanders to go shooting without his father's permission -  would not have been exculpatory or material in light of evidence showing that Ellis kept the H&R shotgun at his house from before the complainant's murder until after the complainant's murder and in light of evidence eliminating the H&R shotgun as the murder weapon. *See Agurs,* 427 U.S. at 110 (holding that mere possibility undisclosed information might have helped defense or might have affected outcome of trial does not establish materiality).

8b. The applicant is essentially arguing that it would have been helpful to have certain information prior to trial or that the State should have emphasized certain information more; however, possible "helpfulness" or "more emphasis" are not the standards to determine whether evidence is exculpatory and material or to determine whether there has been a *Brady* violation – standards that the applicant does not meet. *Hampton v. State,* 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)(holding that mere possibility that item of undisclosed information might have helped defense or might have affected outcome of trial does not establish "materiality" in constitutional sense).

9b.  Habeas court's habeas court's findings 33 – 36 concern events that allegedly occurred years after the applicant's trial and are either not supported by the record and/or do not affect the applicant's due process that he received at trial; the prosecutor's alleged actions after trial – actions that either did not occur, or are misinterpreted, or are not improper - do not establish a *Brady* violation.  *See and cf. Ex parte Miles,* 359 S.W.3d 647, 665 (Tex. Crim. App. 2012)(holding that to establish reversible error under *Brady* and *Bagley,* defendant must show that State failed to disclose evidence; that withheld evidence is favorable to defense; and, that evidence is material – that is, there is reasonable probability that outcome of trial would have been different if evidence had been disclosed).

10b.  Finally, it should be noted that the applicant's trial occurred in 2007, seven years prior to the Michael Morton Act and resulting changes in Texas discovery procedures; thus, the applicant's case should be considered in light of the law and discovery procedures in effect at the time of trial.

Based on the foregoing, the habeas court's findings concerning the alleged suppression of exculpatory evidence are not supported by the record.  The applicant fails to prove that his due process rights were violated at trial.

**III.**

The State respectfully requests that this Court consider the State's Objections to the Habeas Court's Findings of Fact and Conclusions of Law and

recommendations in the applicant's case. The State also respectfully requests that this Court also consider the Respondent's/State's Proposed Findings of Facts and Conclusions of Law in the applicant's case, cause no. 1008763-A (TCA No. WR-78,540-02).

## IV. Certificate of Compliance as Required by Tex. R. App. 73.1(f)

The State of Texas, through its Assistant District Attorney for Harris County, files this, its Certificate of Compliance in the above-captioned cause, having been served with an application for writ of habeas corpus pursuant to Tex. Crim. Proc. Code art. 11.07 § 3. The State certifies that the number of words in the State's Answer is 18,263.

## V. Certificate of Service

On September 8, 2015, this instrument was sent by email to habeas counsel

Stanley Schneider and Casie Gotro:

Stans3112@aol.com
Casie.gotro@gmail.com

Respectfully submitted,

/s/ Roe Wilson
ROE WILSON
Harris County District Attorney's Office
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6656
TBC. No. 14500600
Wilson_Roe@dao.hctx.net

/s/Andrew Smith
ANDREW SMITH
Harris County District Attorney's Office
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6657
TBC No. 24048100
Smith_Andrew@dao.hctx.net



Chambers Of

**Judge Larry Gist**
Drug Impact Court
215 Franklin, Suite 160
Beaumont, TX 77701
409-835-8506
Bestjudge@aol.com



**BOARD CERTIFIED®**
Texas Board of Legal Specialization
**Criminal Law** (1975)
**Criminal Appellate Law** (2013)



**The College**
*of the*
**STATE BAR OF TEXAS**
*Professionalism Through Education*

TO;     Court of Criminal Appeals
        Attn: Abel Acosta, Clerk
        P.O. Box 12308
        Austin, TX 78711

RE:     **No. 1008763-A, 178ᵗʰ District Court**
        **Harris County**
        **Ex Parte David Mark Temple**

DATE; September 8, 2015

By letter dated September 2, 2015, I transmitted to you and requested filing of Findings of Fact and Conclusions of Law. I specifically noted: "This is identical to the original filed in the Court with the addition of citations to the record regarding each finding."

The State has just notified me that this statement was incorrect, because the original had 36 findings and the document sent to you contained a finding No. 37. **I never made finding No. 37 and do not make such a finding now.** Please note to the Court that the document sent to you was tendered to me as being identical to my original findings with the addition of citations. That representation was not correct.

**Please delete finding No. 37 from the document recently sent to you.** Thank you very much for your attention and consideration.

Judge Larry Gist

LJG/sb
Cc: Andrew Smith, ADA Harris County
Stan Schneider, Attorney for Defendant

80